THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

KLEIN-BECKER usa, LLC,　　　　　　)　　　Case No. 2:04CV 01146 DS

　　　　　　Plaintiff,　　　　　)

　　　　vs.　　　　　　　　　　)　　　MEMORANDUM OPINION AND ORDER
　　　　　　　　　　　　　　　　　　RE: PLAINTIFF'S MOTION FOR
　　　　　　　　　　　　　　　)　　　PRELIMINARY INJUNCTION
PRODUCT QUEST MANUFACTURING,
INC., and VITAL SCIENCE, CORP., )

　　　　　　Defendants.　　　　)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## I. INTRODUCTION

　　　　Plaintiff Klein-Becker usa, LLC ("Klein-Becker" or
"Plaintiff") brings this lawsuit against Defendants Product Quest
Manufacturing, Inc. ("Product Quest") and Vital Science, Corp.
("Vital Science") for, among other things, infringement of its
trademark and trade dress.  Pursuant to Fed. R. Civ. P. 65,
Plaintiff has moved the court for a preliminary injunction against
Defendants seeking to enjoin their alleged infringement.  An
evidentiary hearing was held, followed by post-hearing briefing.
For the reasons set forth below, Plaintiff's Motion for Preliminary
Injunction is DENIED.


　　　　Plaintiff is the exclusive licensee for a cosmetic product by
the name of StriVectin-SD® (Striadril™) ( sometimes hereafter
"StriVectin").　　Striadril™ is a proprietary ingredient of

StriVectin.  StriVectin-SD® is a registered trademark in both the United States and Canada.  StriVectin-SD®, introduced in July of 2002, was originally sold as a stretch mark cream.  However, after women started to use the product on their faces and noticed positive results, Plaintiff repositioned it as an anti-wrinkle cream in February of 2003 .  StriVectin-SD® is sold for $135.00 per 6 oz. tube on the internet, at high-end department stores, at GNC stores and at spas and salons.  Plaintiff expends significant resources advertising its product and has gained some national attention.

Defendant Product Quest is in the business of manufacturing private label products for various retail chains.  It manufactures the compound that goes into the container and has the packaging made.  It also acts as a contract manufacturer.  In that role, it makes the product that goes inside the container, but provides no other services.  In January of 2004, Todd Kwait ("Kwait") of Product Quest first learned about StriVectin-SD® and began to consider doing a value brand alternative.  Kwait has a history in the anti-wrinkle skin care products. After a period of research, Product Quest began to manufacture and distribute NuVectin™ as a therapy for wrinkles.  NuVectin™ is sold for $24.99 per 6 oz. tube at retail outlets such as drug stores and supermarkets.

Defendant Vital Science is a Canadian company that purchases the compound that goes inside the tube from Product Quest. Vital Science markets its product in Canada as Dermaglow NuVectin. Vital Science does not market its product in the United States and has taken affirmative steps to prevent sales in the United States. Dermaglow NuVectin sells for $120.00 Canadian.

## II.   STANDARD FOR INJUNCTIVE RELIEF

To obtain a preliminary injunction, a party must clearly establish the following: (1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party: and (4) the injunction is not adverse to the public interest. *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir 2001). Certain preliminary injunction requests, however, are disfavored at law and are subject to a heightened burden. They include: "(1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits." *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098-99 (10th Cir. 1991). The heightened burden was recently modified in *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975-976 (10th Cir.

3

2004)(emphasis added), *cert. granted*, 73 U.S.L.W. 3498 (U.S. April 18, 2005)(No. 02-2323).

> With one important alteration, a majority of the *en banc* court has voted to affirm the core holding of *SCFC ILC*. ... Thus, **if a movant seeks a preliminary injunction that falls into one of the three categories identified in *SCFC ILC*, the movant must satisfy a heightened burden. The *en banc* court does, however, jettison that part of *SCFC ILC* which describes the showing the movant must make in such situations as "heavily and compellingly."** *SCFC ILC*, 936 F.2d at 1098. **Instead, the *en banc* court holds that courts in this Circuit must recognize that any preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course.** Furthermore, because a historically disfavored preliminary injunction operates outside of the normal parameters for interim relief, **movants seeking such an injunction are not entitled to rely on this Circuit's modified likelihood-of-success-on-the-merits standard. Instead, a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms,** and may not rely on our modified likelihood-of-success-on-the-merits standard.

Plaintiff moves the Court to enjoin Defendants from, among other things, continuing to use the name NuVectin™ or any cosmetic product utilizing a vectin suffix, and from selling products "which bear Klein-Becker's trade dress or any confusingly similar variation thereof". Compl. at 19. Because the relief sought would alter the status quo and is mandatory, Plaintiff must meet the heightened burden, as set forth above, for a preliminary injunction to issue.

### III. DISCUSSION

Plaintiff seeks to enjoin Defendants from infringing in any way on either its trademark or trade dress.

### A.   Likelihood of Success on the Merits.

As noted above, Plaintiff must make a strong showing with regard to the likelihood of success on the merits.   Having considered all the relevant factors as a whole, the Court, for the reasons that follow, concludes that Plaintiff has failed to meet its burden of a strong showing of likelihood of success on the merits as to either its trademark infringement claim or its trade dress infringement claim.

### 1.   Trademark Infringement

A trademark includes " any word, name, symbol, or device or any combination thereof ... to identify and distinguish ... goods ... from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown".   15 U.S.C. § 1127. Unauthorized use or imitation of a registered mark in commerce in a way that is likely to cause confusion is prohibited. *Id*. at § 1114.   "The key inquiry in a trademark infringement case is the likelihood of confusion between two similar marks." *Team Tires Plus, LTD. V. Tires Plus, Inc.*, 394 F.3d 831, 832 (10th Cir. 2005). The Tenth Circuit has identified a non-exhaustive list of factors

5

to be considered as an interrelated whole in determining whether a likelihood of confusion exists between similar marks:  "(1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks."  *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002).

### a.  similarity of marks

"The degree of similarity between marks rest on sight, sound, and meaning. This court must determine whether the allegedly infringing mark will confuse the public when singly presented, rather that when presented side by side with the protected trademark."  *Id*. at 972 (citations omitted).  In making the comparison, "similarities are weighed more heavily than differences, particularly when the competing marks are used in virtually identical products packaged in a similar manner."  *Id*.

Plaintiff asserts that both StriVectin and NuVectin™ are three syllable words that share the root vectin which is set off from the prefix with a capital V; when pronounced, the marks sound similar; and, the marks look similar and are presented on the packaging with similar font.  Defendants urge, and the court agrees, that any

comparison must be to Plaintiff's mark in its entirety as encountered in the marketplace. *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir. 1999). Although after Product Quest filed its trademark application for NuVectin™, Plaintiff filed an "intent to use" application for the trademark StriVectin (without the "-SD"), it is un-controverted that Plaintiff does not use StriVectin as a mark on any of its products. Plaintiff's registered mark is StriVectin-SD® which is consistently, but not exclusively, used with the mark Striadril™. For purposes of determining likelihood of confusion, therefore, the comparison of Defendants' NuVectin™ mark is to StriVectin-SD® or StriVectin-SD® (Striadril™). The only common element in the marks  is the word vectin which has been used on a variety of products by others. Before marketing NuVectin™ Product Quest ordered a Thompson & Thompson trademark availability report on the name vectin. That report identified products called AdVectin, AlloVectin-7, AlloVectin, LeuVectin, and EuVectin, as well as numerous products with names that sound like vectin. When the designations "Stri" and "-SD", and/or "Striadril™" are added to the word Vectin, the court is not persuaded that Plaintiff has met its burden of establishing that either StriVectin-SD® or StriVectin-SD® (Striadril™) is so similar to NuVectin™ or Dermaglow NuVectin that the consuming public will be confused. Moreover, any similarity in the marks is disavowed by a "compare to" statement and by a disclaimer of

7

affiliation with Klein-Becker which appear on the NuVectin™ point-
of-sale displays, shelf talkers, store banners, and since March 7,
2005, on the NuVectin™ box. *See, e.g., Pfizer, Inc. v. Perrigo Co.*,
988 F. Supp. 686 (S.D.N.Y.)(considering "compare to" language in
ruling that products were not similar).  This factor weighs in favor
of Defendants.


     **b.  intent to copy**

     "Proof that a defendant chose a mark with the intent of copying
the plaintiff's mark may, standing alone, justify an inference of
likelihood of confusion." *Sally Beauty Co., Inc.*, 304 F.3d at 973.
"The proper focus under this factor is 'whether defendant had the
intent to derive benefit from the reputation or goodwill of
plaintiff.'" *King of the Mountain Sports, Inc.* 185 F. 3d at 1091
(citation omitted).


     Plaintiff contends that Defendants' choice of the name
NuVectin™ illustrates their intent to copy and "was chosen because
it utilized the dominant root of the StriVectin trademark name -
Vectin". Pl['s] Post-Hearing Mem. at 11.  Mr. Kwait of Product
Quest acknowledges that after seeing StriVectin-SD® advertized in
a magazine, he was drawn to the idea of doing a value brand
alternative to the product because of its $135.00 price, and because
it was marketed at exclusive stores.  However, Product Quest denies

any intent to deceive or confuse consumers.  Before selecting the name NuVectin™, Product Quest states that it took care in selecting and checking its product name.  It conducted a search on the U.S. Patent and Trademark site and found no conflict.  It ordered a Thompson & Thompson trademark availability search report on the name vectin.  That report identified products called AdVectin, AlloVectin-7, AlloVectin, LeuVectin, and EuVectin, as well as numerous products with names that sound like vectin.  Kwait learned that AlloVectin is used for the treatment of skin cancer.  In its Complaint, Plaintiff claims that "StriVectin is an arbitrary word chosen by Klein-Becker as its trademark in part due to its uniqueness."  Compl. At ¶ 16.  With regard to the term vectin, the evidence presented suggests otherwise.  In sum, the court finds that, although Defendants use of the word Vectin appears to be intentional, there is no evidence of intent to deceive, nor in terms of the key inquiry to be made by the Court, no evidence of intent to confuse consumers.  On balance, therefore, the Court weighs this factor in favor of Defendants.

### c.  evidence of actual confusion

"Although not necessary to prevail on a trademark infringement claim, evidence of actual confusion in the marketplace may be the best indication of likelihood of confusion."  *Sally Beauty Co.*, Inc., 304 F.3d at 974.   As evidence of confusion, Plaintiff points to

an email from the Vice President of Worldwide Marketing for Mrs. America and Mrs. World brands regarding promotional opportunities and apparently confusing Plaintiff as the maker of NuVectin™. Plaintiff also cites reports of store employees confusing StriVectin-SD® with NuVectin™ when asked for StriVectin, inquires to Vital Science about StriVectin, and an isolated newspaper story in Canada describing Dermaglow NuVectin as the equivalent of StriVectin-SD®.

"To be relevant ... evidence should demonstrate actual confusion among consumers within the marketplace." *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 557 (10th Cir.), *cert. denied*, 525 U.S. 964 (1998).  The evidence presented appears to fall short of that standard.  Moreover, Plaintiff's evidence of confusion is *de minimis*.  *See Sally Beauty Co., Inc.*, 304 F.3d at 974 ("Evidence of actual confusion does not create a genuine issue of fact regarding likelihood of confusion if it is *de minimis*"); *King of the Mountain Sports, Inc.*, 185 F.3d at 1092 ("handful of anecdotal evidence is *de minimis* and does not support a finding of a genuine issue of material fact as to the likelihood of confusion").  This factor weighs in favor of Defendants.

### d.  similarity of products and manner of marketing

"'The greater the similarity between the products ... the greater the likelihood of confusion.'" *Universal Money Ctrs., Inc. v. Am Tel & Tel. Co.*, 22 F.3d 1527, 1532 (10th Cir.), *cert. denied*, 513 U.S. 1052 (1994)(citation omitted).  This factor is analyzed by "separately considering (1) the similarity of products and (2) the similarity in the manner of marketing the products." *Sally Beauty Co., Inc.*, 304 F.3d at 974.


Both StriVectin-SD® and NuVectin™ are marketed as anti-wrinkle creams, although the packaging for StriVectin-SD®  specifically identifies it as intended for stretch marks.  Plaintiff uses the marketing theme "Better than Botox®?" on its point-of-sales displays and on its product insert.  The price differential in the Untied States is significant.  And notwithstanding that Plaintiff asserts that it has not foreclosed any sales channels, it concedes that its product is not sold in the same channels as Defendants' products.  On balance this factor weighs in favor of Defendants.


### e.  degree of care exercised by consumers

"A consumer exercising a high degree of care in selecting a product reduces the likelihood of confusion. ... The relevant inquiry focuses on the consumer's degree of care exercised at the time of purchase." *Sally Beauty Co., Inc.*, 304 F.3d at 975.  A

11

January 20, 2005 NPD Press Release reports that the consumer of StriVectin-SD® is 45 years old or older, affluent and educated. "Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source or sponsorship of the product." *Bristol-Myers Squibb Co.* v. *McNeil-P.P.C. Inc.*, 973 F.2d 1033, 1046(2d Cir. 1992). Because StriVectin-SD® sells in the United States for $135.00 per 6 oz. tube, more than five times the retail price of NuVectin™ at $24.99, it is reasonable to conclude that customers exercise a significant amount of care when they purchase Plaintiff's product. Defendant Vital Science affirmatively prevents sales of Dermaglow NuVectin in the United States. This factor weighs in favor of Defendants.

### f. strength of the StriVectin-SD® mark

"The stronger the mark, the greater the likelihood that encroachment on the mark will cause confusion." *Sally Beauty Co., Inc.*, 304 F.3d at 975-976. "To assess the relative strength of a mark, one must consider the two aspects of strength, (1) 'Conceptual Strength: the placement of the mark on the [distinctiveness or fanciful-suggestive-descriptive] spectrum;' and (2) 'Commercial Strength: the marketplace recognition value of the mark,'" *King of the Mountain Sports, Inc.*, 185 F.3d at 1093.

"The categories of trademarks in ascending order of relative strength are: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary: or (5) fanciful." *Sally Beauty Co., Inc.*, 304. F.3d at 975-976. These marks have been defined as follows:

> A generic term is a term used to describe the relevant type or class of goods.  It is the weakest mark and cannot become a trademark under any circumstances.  A descriptive term describes a characteristic of a product or service.... The third, and stronger, mark is the suggestive mark, which suggests rather than describes a characteristic of the product and requires the consumer to use imagination and perception to determine the product's nature.  Finally, the arbitrary or fanciful mark is the strongest mark.  An arbitrary mark has a common meaning unrelated to the product for which it has been assigned, such as APPLE when applied to computers, while a fanciful mark, such as KODAK or EXXON, signifies nothing but the product.

*First Sav. Bank v. First Bank Sys., Inc.*, 101 F.3d 645, 654-55 (10th Cir. 1996) (citation omitted).  "Suggestive, fanciful, and arbitrary marks are considered inherently distinctive and entitled to trademark protection." *Sally Beauty Co., Inc., 304 F.3d at 976.*

Plaintiff claims that because StriVectin-SD® is a coined or fanciful mark it is a strong mark.  Plaintiff also claims entitlement to a rebuttable presumption that the mark is inherently distinctive because its mark was accepted for federal registration. At the very least, Plaintiff claims that its mark is suggestive and, therefore, requires no evidence of secondary meaning.   Product Quest, on the other hand, asserts that Plaintiff's mark is descriptive, and therefore weak, because it describes the product

13

as a stretch mark cream and because the mark describes the key ingredient in the product.

The Court is not persuaded based on the evidence and testimony presented that StriVectin-SD® is a coined or fanciful mark.  The Court agrees with Defendants that Plaintiff's Gina Gay was not forthcoming in her testimony regarding how the StriVectin-SD® name was developed.  The evidence suggests that vectin, or words sounding similar to vectin, were in use prior to Plaintiff's "coining" of StriVectin.  *See, e.g., Universal Money Ctrs.,* 22 F.3d at 1532 (quoting *Exxon Corp. v. Texas Motor Exch.*, 628 F.2d 500, 504 (5th Cir. 1980)( "' The greater the number of identical or more or less similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion' between any two specific goods incorporating the weak mark.").  Although Plaintiff may have been the first to adopt the prefix "Stri" for a cosmetic product, it was not the first to use the term vectin in commerce in connection with a skin product.  Similarly, the court is not persuaded by the testimony and evidence presented that the mark is suggestive as urged by Plaintiff or merely descriptive as Defendants suggest.  Although, Plaintiff acknowledges that "SD" stands for Striadril™, one of the ingredients of StriVectin-SD®, which suggests a descriptive quality, the court agrees with Plaintiff that the general public will not recognize the meaning of SD.  Likewise, even

14

if Plaintiff had not denied that "Stri" or "SD" are intended to refer to stretch marks, the general public is not likely to recognize the meaning of those designations.

Plaintiff touts the commercial strength of its mark and its acquisition of secondary meaning by pointing to its sales success, dollars spent on advertising and unsolicited media coverage as well as to the number of so called knock-offs coming to market.  Based on the foregoing, Plaintiff asserts that "[c]learly, StriVcetin is a well known phenomenon in the cosmetic industry.  Pl['s] Post-Hearing Mem. at 34.  Defendants counter that the NPD Report relied upon by Plaintiff to show consumer recognition found that fewer than five percent of the target market was even aware of StriVectin-SD®.  Five percent name recognition, Defendants contend, simply is inconsistent with any claim of strong name and trade dress recognition.  Defendants also note that Plaintiff presented no consumer surveys, studies, evaluations or reports regarding recognition of the StriVectin-SD® trademark.

After considering both the conceptual and commercial strength of StriVectin-SD®  the court finds the evidence and testimony presented inconclusive.  Therefore, the strength of mark factor favors neither Plaintiff or Defendants for purposes of the present motion.

15

2.  **Trade Dress Infringement.**

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides a federal cause of actions for unprivileged imitation , including a claim for trade dress infringement.  "Trade dress features are those comprising a product's look or image."  *Vornado Air Circulation Systems, Inc., v. Duracraft Corp.*, 58 F.3d 1498, 1502 (10th Cir. 1995), *cert. denied*, 516 U.S. 1067 (1996).  To prevail on this claim, Plaintiff must "demonstrate (1) that its trade dress is inherently distinctive or has become distinctive through secondary meaning; and (2) likelihood of confusion. ... In addition, the party asserting trade dress infringement bears the burden of demonstrating that the trade dress is not functional."  *Sally Beauty Co.*, *Inc.*, 304 F.2d at 977.


a.  **distinctiveness and secondary meaning**

"A trade dress is inherently distinctive if its 'intrinsic nature serves to identify a particular source.' ... Such trade dresses 'almost automatically tell a customer that they refer to a brand and immediately signal a brand or product source."  *Id*. (citation omitted).  Similar to trademarks, "the inherent distinctiveness of a trade dress is categorized along the generic-descriptive-suggestive-arbitrary-fanciful spectrum."  *Id*. "A trade dress which is not inherently distinctive, however, may acquire distinctiveness through secondary meaning. ... In other words, over

16

time customers may associate the primary significance of a dress feature with the source of the product rather than the product itself." *Id*.

Plaintiff asserts that its trade dress is inherently distinctive or has become distinctive through acquisition of secondary meaning. In support of its position, Plaintiff cites what it claims to be the substantial sales of StriVectin-SD® and Defendants' intentional copying of its trade dress.

> As the Tenth Circuit observed in *Sally Beauty*, distinctiveness can be shown by "(1) a history of successful sales; (2) evidence of intentional copying by [Defendants]; and (3) long use of the [Plaintiff's] trade dress. 304 F.3d at 978. Here, the remarkable and substantial sales of Klein-Becker's StriVectin product are uncontroverted. ... The evidence of Defendants' intentional copying includes their own admission of adopting Klein-Becker's trade dress as their own working template, as well as their admitted adoption of identical and identically dimensioned packaging, the same (pink and white) color scheme, the same ornamental pink band, the same ornamental open circle, and even the same POS display, speak volumes about Defendants' intent.

Pl['s] Post-Hearing Mem. at 35.

Plaintiff claims to have sold millions of dollars worth of product, although no specific sales figures for StriVectin-SD® were introduced into evidence. Therefore, it is difficult to discern what level of sales success Plaintiff has achieved. In any event, it appears to the Court that many of Plaintiff's trade dress features, such as size, shape, color and graphics are generic or

commonplace.  Several features, such as the flip-top tube and the rectangular box appear to be functional.  Plaintiff's Ms. Gay acknowledged that Klein-Becker was not the first to use 6 oz. squeeze tubes, white tubes, tubes sealed at one end, plastic flip tops, dark lettering, product information, pink accents or borders on a white tube, circular graphics or a rectangular box. Additionally, although Plaintiff claims to use the same trade dress features on all of its family of products "so as to inform consumers that each product is part of the Klein Becker family, *id*. at 36, Ms. Gay conceded during cross-examination that the size, shape and other color schemes for each of Klein-Becker's products are not consistent with one another.

Product Quest concedes that "[t]o achieve the private label industry goal of providing less expensive but similar alternatives, the private label industry always creates a physical resemblance between a private label product and the name brand product with which it competes.  The resemblance between these types of products serves to alert consumers to the functional equivalence between the two."  Post-Hearing Mem. at 5.  That this is a common practice was effectively demonstrated to the Court by means of Product Quest's slide presentation at the hearing of this matter illustrating numerous competing brand and private label products, as well as the numerous photographic examples of the same attached to its post-

hearing memorandum. *See, e.g., Conopco, Inc. v. May Dept. Stores Co.*, 46 F.3d 1556, 1565 (Fed. Cir. 1994), *cert. denied*, 514 U.S. 1078 (1995)(where "retailer packages its product in a manner to make it clear to the consumer that the product is similar to the national brand, and is intended for the same purposes" and "[w]hen such packaging is clearly labeled and differentiated ... such competition [is not presumed] unlawful"). Notwithstanding the resemblance between Plaintiff's and Defendants' trade dress, Product Quest notes, and the Court acknowledges, the following differences. Product Quest does not use the "Better than Botox® ?" slogan as the central theme for its advertising campaign, nor does it use the "KD" logo, nor does it use the Klein-Becker name except to disclaim affiliation. Klein-Becker has its name and "KB" logo on its box. Product Quest's name is on its box. Vital Science's name is on its box. The StriVectin-SD® packaging refers to itself as therapy for stretch marks. The largest print on the NuVectin™ box says "Wrinkle Therapy" and does not mention stretch marks. NuVectin™ is in a white box, whereas StriVectin-SD® is in an olive-greenish box. The NuVectin™ box has a "top band" in a gray color whereas Plaintiff's box does not have such a top band. The font sizes on both are different . The decorative circle on each is a different style and color. The decorative band on each is positioned differently and a different color. The NuVectin™ tube emulates the NuVectin™ box.

As noted, Plaintiff relies on what it characterizes at its substantial sales of StriVectin-SD® and Defendants' alleged intentional copying to establish secondary meaning.  Sales volume alone is not sufficient to show secondary meaning, but when combined with other evidence such as intentional copying, may indicate secondary meaning.  *Sally Beauty Co. Inc.*, 304 F.3d at 978.  Gay's general testimony that StriVectin-SD® has enjoyed significant sales growth since its inception is essentially un-controverted, although no specific sales figures were introduced.  However, as discussed above, Plaintiff has not met its burden for purposes of the present motion that Defendants unlawfully copied its trade dress.  The court also notes that Plaintiff's trade dress has been in use only since July or August of 2002.  The NPD report relied upon by Plaintiff found that fewer than five percent of the target market was aware of StriVectin-SD®.  Also as noted, many of Plaintiff's trade dress features appear to be commonplace, and several can be characterized as functional.  In sum, based on the evidence and testimony presented, the court concludes that Plaintiff has failed in its burden of showing that its trade dress is either inherently distinctive or has acquired secondary meaning.

### b.  likelihood of confusion

"In the trade dress context, the relevant inquiry is 'whether there is a likelihood of confusion resulting from the total image

and impression created by the defendant's product or package on the eye and mind of an ordinary purchaser.'" *Sally Beauty Co., Inc.*, 304 F.3d at 979 (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 8:15 (4th ed.)) The same factors analyzed in a trademark infringement context also apply in a trade dress context. *Id*.

Without belaboring the matter further, the court concludes that Plaintiff has not met its burden of showing a likelihood of confusion. Evidence of actual customer confusion is absent or at best *de minimis*. Plaintiff's packaging appears to be commonplace. While Plaintiff's and Defendants' trade dress have common elements and, therefore, are similar, the Court is not persuaded that the ordinary purchaser is likely to be confused. The products are marketed through different channels and in the Untied States at significantly different prices. The point-of sale display states that NuVectin™ is a cheaper version of StriVectin-SD®, "Compare to the price of StriVectin-SD® at $135.OO in Department Stores". The displays also feature a disclaimer stating: "This product is not manufactured or distributed by Klein-Becker USA LLC, the licensed owner of the registered trademark StriVectin-SD®". Additionally, "starting on March 7, 2005, all of the Nuvectin™ product that is now being shipped has a yellow sticker on the box stating 'A Superb Value Alternative to StriVectin-SD®*'. The asterisk takes the

customer to an explicit disclaimer of any affiliation with Klein-Becker: 'This product is not manufactured or distributed by Klein-Becker™ USA, LLC, the exclusive licensee of the registered trademark StriVectin-SD®.'" Kwait Aff. ¶ 5.  Authority supports the use of "compare to" statements, finding such statements avoid customer confusion.  *See, e.g., Pfizer*, *Inc.* v. *Perrigo Co.*, 988 F. Supp. 686, 686 (S.D.N.Y 1997)("the labels in Group C urge the consumer to 'Compare to PLAX®.'  This admonition would surely help reduce or eliminate any potential confusion as to whether the product was a Pfizer product); *Warner Lambert Co. v. McCroy's Corp.*, 718 F. Supp. 389, 398-99 *(*D.N.J. 1989*)*("prominent use of 'compare and save' signs on shelves ... further distinguish the two products from each other in the minds of prospective consumers"); *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.* 756 F. Supp 280, 282 (W.D. La. 1991), *aff'd*, 988 F.2d 587 (5th Cir. 1993) ("a disclaimer expressly declaring that the seller is 'not affiliated' with the owner of the trademark has been held to be an effective means of preventing confusion in the minds of consumers as to affiliation with the owner of the trademark in question).

## B.  Irreparable Injury

Asserting that it has shown a likelihood of confusion, Plaintiff claims that irreparable harm is presumed.  Because the Court is not persuaded that Plaintiff has established a likelihood

of customer confusion, a presumption of irreparable harm does not arise.

### C.  Balance of Harms

As noted earlier, Plaintiff must make a strong showing with regard to the balance of harms.  Plaintiff simply claims that injury to it "outweighs any possibility of harm to Defendants because the requested relief does nothing more than return the parties to the status quo as it existed before Defendants engaged in unlawful acts."  Pl['s] Mem. Supp. at 25.  Because Plaintiff has not established that Defendants engaged in unlawful acts, it has failed in its burden of proof on this issue.

### D.  Public Interest

Plaintiff urges that the public interest favors protection of intellectual property rights.  Defendants counter that the public interest is best served by competition and the availability of lower priced alternative products.  Without more, the Court is not persuaded that Plaintiff has carried its burden on this issue.

### III.  CONCLUSION

For the reasons stated as well as generally for those reasons set forth by Defendants in their pleadings,  the Court concludes

that Plaintiff has failed to meet its burden of proof for a preliminary injunction to issue.

**THEREFORE IT IS ORDERED** that Plaintiff Klein-Becker's Motion for a Preliminary Injunction is **DENIED.**


DATED this 2nd day of June,2005.

BY THE COURT:


DAVID SAM
SENIOR JUDGE
UNITED STATES DISTRICT COURT

24